Filed 5/27/21  P. v. Vargas CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>MIGUEL ANGEL VARGAS,<br><br>    Defendant and Appellant. | F077967<br><br>(Super. Ct. No. DF012823A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  John D. Oglesby, Judge.

Hilda Scheib, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman, Harry Joseph Columbo, and A. Kay Lauterbach, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

A jury convicted defendant Miguel Angel Vargas of various offenses and enhancements related to his attack on a fellow inmate during which defendant cut the

inmate's face, requiring the inmate to get 21 sutures. The jury also convicted defendant of aggravated battery by an inmate on a state prison officer (Pen. Code, § 4501.1) after defendant spat a substance believed to be blood at an officer through the food port of defendant's cell. (Undesignated statutory references are to the Penal Code.)

During jury deliberations, the trial court discharged a juror over defendant's objection and replaced the juror with an alternate after concluding the juror was influenced by a situation at his workplace that prevented him from functioning as a fair and impartial juror. On appeal, defendant argues the court reversibly erred in discharging the juror. Defendant also contends the court prejudicially erred in refusing to instruct the jury on self-defense regarding the charges arising from his assault on a fellow inmate. He further asserts remand is necessary to permit the court to exercise its newfound discretion pursuant to Senate Bill No. 1393 (2017–2018 Reg. Sess.) (Senate Bill 1393) and consider whether to strike defendant's section 667, subdivision (a) enhancement. Finally, in supplemental briefing, the parties concede defendant's prior prison term enhancements must be stricken under Senate Bill No. 136 (2019–2020 Reg. Sess.) (Senate Bill 136).

We conclude defendant is entitled to remand for resentencing under Senate Bill 1393 and, on remand, the trial court must strike the prior prison term enhancements. In all other respects, we affirm the judgment.

## FACTUAL BACKGROUND

### *January 2, 2017, assault against fellow inmate*

Inmate Julio Rocha was housed in Wasco State Prison on January 2, 2017. At trial, Rocha testified he was walking down the stairs that day during the evening meal pass and getting his tray when he felt something cut him from behind. Rocha turned around and saw someone going upstairs; Rocha chased him. He neared the person and tried to throw him downstairs, but he was unable to. The officers began telling Rocha to get down, so he walked away and got down. At trial, Rocha identified defendant as the person who cut him. Rocha asked defendant who sent him and defendant responded, "2-

2.

5," which is a prison gang. Rocha explained he associated with 2-5ers at one point but then he dropped out and asked that his name be taken off the gang "roll call" approximately three years before the January 2017 attack. Rocha was searched after the incident, but no weapons were found on him.

Officer George Chacon was on watch at a control booth in the unit that day. He controlled the release of the prisoners from their cells for dinner, and he began releasing them one section at a time beginning with the lowest tier. As he was releasing the upper tier, he heard Officer Alex Mendoza shout, "Get down." Chacon then saw two inmates fighting "with clenched fists [punching each other] in the upper facial area and chest area"; "[t]hey were fighting toe to toe." He did not see anything that occurred between the inmates before he heard Officer Mendoza's command.

Officer Jacob Carter responded to a code regarding an inmate fight at approximately 6:35 p.m. on January 2, 2017. As he arrived at the housing units, he looked around and saw "all the inmates were down in a prone position." Defendant was "proned out" in front of cell 225; he was housed in cell 227. Inmate Rocha was "proned out" near cell number 221. Carter searched the area for weapons and evidence. The cell doors were closed because the inmates had been walking to dinner at the time. There were no inmates in cell 225. Carter explained inmates utilize a one-and-a-half-inch gap between the floor and the cell to pass contraband. During his search, Carter recovered "what looked like … a slashing device … right by the door of [cell] 225"; it was in the middle of the doorway. It appeared to be a sharp razor with the handle taken off and the razor was tied to the handle with string. Carter believed it was made from a "shaving razor." Another officer testified this was the most common type of weapon seen in prison.

Licensed vocational nurse Laura Bernal initially examined Rocha. Rocha had a bruise on his arm, dried blood on his knuckles, fingers, and down his chest, and a bruise on his inner right thigh in addition to a "pretty bad slash" across his face. Bernal

3.

documented Rocha's injuries and secured a pressure dressing to his face before moving him to the "T.T.A." (triage and treatment area). Dr. Andrew Zepp then tended to Rocha's laceration. He noted the wound was 12 centimeters in length and it extended from Rocha's right earlobe to the middle of his cheek. According to Zepp, the wound was not going to close on its own without some kind of "closure procedure," so he sutured it with 21 stitches. He explained the wound "was not a laceration made for cosmetic intent," meaning it was "not going to heal nice"; "[n]o matter how you try to close it, it's gonna leave a scar." Officer Jose Aceves explained that type of facial injury was often referred to as a "bitch mark" or a "puta mark." It "usually signifies that the person who received it is either a snitch, a rat, or has some sort of sex offense, whether he's a child molester or rapist." Officer Aceves had also seen gang dropouts with such a mark because they were "basically considered a snitch."

Licensed vocational nurse Marilyn Kazaryan examined defendant in a holding cage after the altercation. He had dried blood on his forehead, the back of his head, and on his left thumb and right hand. The right side of his head, left inner arm, and right chest were all red.

### January 20, 2017, incident with Officer Gonzales

Sean Gonzales was working as a correctional officer in January 2017. He was working in the administrative segregation (Ad Seg) unit in Wasco State Prison on January 20, 2017. At trial, Gonzales explained Ad Seg was considered "a prison within the prison"; inmates are sent there to separate them from the general prison population. Gonzales explained the cell doors are made of slotted metal and plexiglass, and they have a port through which laundry and meals are passed. There is a latch with a locking system on the port.

Defendant was housed in the bottom tier of the Ad Seg unit on January 20, 2017. Officer Gonzales recalled opening the port to defendant's cell and collecting and returning defendant's laundry that day without incident. Later that afternoon, Gonzales

4.

unlocked the port to defendant's cell again to serve him "chow." When Gonzales returned to pick up defendant's tray, defendant "grab[bed] the food port." Gonzales asked defendant to move his arm so Gonzales could lock the port; defendant moved his food tray and pulled his arm back into the cell. According to Gonzales, as he approached to close the port, defendant was hunched down near it and spit on him. Gonzales was trained to wear a face shield but was not wearing his that day. Gonzales stepped back and activated his body alarm at 5:20 p.m. He saw defendant open his mouth to smile and defendant's teeth and mouth were red; Gonzales believed the red was caused by blood. Gonzales did not notice any cuts or injuries on defendant though he did not examine defendant's mouth.

Gonzales did not wipe his face at that time because, according to him, "once an inmate assaults you like that, you're evidence." Gonzales dabbed his face though and saw there was blood on it. He grabbed his pepper spray and ordered defendant to move back from the cell door. Defendant refused to move.

Gonzales approached again to try to close the food port and he heard defendant clearing his throat; Gonzales thought it sounded like defendant was "about to spit again." At that point, Gonzales discharged his pepper spray from about four feet away from the port. He explained the spray has a "strong effect." It causes redness if it hits the face, burns the eyes, and causes the nose to run. Defendant moved back into the cell away from the port in response. Gonzales held his pepper spray at the port in case defendant tried to return. Gonzales explained the pepper spray was an orange color.

When the other correctional officers responded, they took control of the situation because Gonzales had been "assaulted." Gonzales reported to his sergeant, Sergeant Maddox, that defendant spit what he believed to be blood on him. At trial, officers Miguel Franco and Sharon Gonzalez testified they recalled seeing blood on Officer Sean Gonzales's uniform and on his face after the incident. Franco also noticed blood in front of the door to defendant's cell. Franco commanded defendant to turn around, and he

5.

proceeded to handcuff defendant through the port. Sergeant Maddox ordered the door to defendant's cell be opened, and Franco noticed pepper spray inside the cell that was an "orange-ish, yellowish color." Officer Franco testified he made a report after the incident, but he did not mention seeing blood anywhere in the report. He recalled receiving followup questions after the incident as well, but Franco never mentioned anything to his captain about seeing blood in the area during the investigation.

Officers escorted defendant to a temporary holding cell after placing a "spit hood" on him, which prevented him from spitting again. Defendant was calm and compliant. Franco did not notice blood on defendant's mouth. Defendant was medically evaluated in the holding cell. Officer Franco asked defendant if he wanted to get water since he was sprayed with pepper spray; defendant said, "no."

Officer Sean Gonzales was rushed to the T.T.A. where he reported an inmate had spit blood on his face. Gonzales still had not wiped his face and Officer Sharon Gonzalez took pictures of him while he was at the T.T.A. At trial, Officer Sharon Gonzalez testified the pictures she took did not fully capture the blood on Officer Sean Gonzales's face; it was more visible in person.

Registered nurse Katarzyna Bialous had Officer Sean Gonzales provide a written statement during her assessment of him. She observed blood on his face below his eyes and on his uniform, though she mistakenly circled the eye area on a diagram where she was to indicate the area of injury. She had Officer Gonzales complete an exposure packet in which Officer Gonzales indicated he was not exposed to pepper spray.

At trial, Officer Gonzales explained officers are trained to begin an "AIDS cocktail" regimen if they come in contact with a bodily fluid, particularly blood. Gonzales was given the first dose of the AIDS cocktail while at the T.T.A. He was warned the AIDS cocktail was a "complete flush of the body" and that he was not going to feel good once he started it as he would have extreme diarrhea, vomiting, and fatigue. He elected to undergo the treatment because he had been in contact with blood. He was

6.

then transferred to a hospital and was off work for about two weeks during which he took the medication. He experienced extreme fatigue, diarrhea, and vomiting. He also noticed blood in his urine and feces. Officer Gonzales ended up going to the emergency room because his urine was a very dark brown and, ultimately, he had to discontinue the AIDS treatment. He never found out if defendant had any diseases that he was trying to protect against.

In his defense, defendant called psychiatric technician Brooke Silva to testify at trial. She had examined defendant at 5:26 p.m. from outside of a holding cell after the January 20, 2017, incident—six minutes after Officer Gonzales sounded his alarm. Silva explained she did three checks of defendant over 15-minute intervals to make sure he was okay after being exposed to pepper spray. As part of the checks, Silva looked in defendant's mouth with a flashlight. Silva did not see anything she believed to be blood around defendant's face or on his teeth, just a little bit of the pepper spray but it was not the red color of blood. Silva testified the pepper spray was an orange-reddish color that looked like flaky dried paint. There were no open wounds.

### Verdict and sentencing

The jury convicted defendant of mayhem in violation of section 203 (count 1), enhanced by an allegation he personally used a deadly or dangerous weapon within the meaning of section 12022; assault with a deadly weapon by a prisoner in violation of section 4501 (count 2), enhanced by an allegation he personally inflicted great bodily injury upon Rocha, not an accomplice, within the meaning of section 12022.7; possession of a weapon by a prisoner in violation of section 4502 (count 3); and aggravated battery on a peace officer by gassing in violation of section 4501.1 (count 4). The court found true numerous prior conviction allegations, including prior serious felony conviction allegations pursuant to section 667, subdivision (a), and prior prison term allegations under section 667.5, former subdivision (b).

On count 1, the court sentenced defendant to 25 years to life, plus a one-year enhancement under section 12022, subdivision (b), two 5-year enhancements under section 667, subdivision (a), and a one-year prior prison term enhancement under section 667.5, former subdivision (b) on count 1. On count 2, the court sentenced defendant to a term of 25 years to life, plus a three-year enhancement under section 12022.7, subdivision (a) and a one-year term under section 667.5, former subdivision (b), with the sentence stayed pursuant to section 654. On count 3, the court sentenced defendant to the upper term of eight years, stayed pursuant to section 654. And on count 4, the court sentenced defendant to the upper term of eight years, enhanced by one year pursuant to section 667.5, former subdivision (b), to be served consecutively, for a total term of 25 years to life plus 21 years.

## DISCUSSION

### I. The Court Did Not Err in Discharging a Juror During Deliberations

Defendant first contends the court erred in discharging a juror during deliberations.

#### A. Relevant Factual Background

Before trial, the court advised the jurors, "You must not allow anything that happens outside of the courtroom to affect your decision unless I tell you otherwise," "You must use only the evidence as presented in the courtroom or during a jury view." The court also instructed the jury, "Do not let bias, sympathy, prejudice or public opinion influence your decision."

The day after the jury was released for deliberations, the court convened with counsel outside of the jury's presence and explained it had received a note from the foreperson that stated, "'We have a potential conflict of interest due to one of the juror's pending litigation. This may be causing personal bias. The [juror] just recognized this today during deliberation.'" The court believed further inquiry of the foreperson was

8.

required to understand "more specifically what they mean by this." Counsel agreed so long as the inquiry was neutral and did not invade into the jurors' mental processes. The court then brought in the foreperson to comment upon the note.

The foreperson explained: "This just came to us this morning. He was—said— you know, we haven't been able to reach a verdict. And he said that he felt like he really should not be on this jury because he has an issue. He's a school employee, and there's something—some type of litigation pending. And I believe that you probably need to speak with him directly." The foreperson identified the juror in question for the court. The foreperson further stated, "He can give you more details. I really am not privy to all of that that's going on, but it's causing him concern." In response to the court asking whether the juror in question was continuing to deliberate or discuss the case with the other jurors, the foreperson responded, "He's kind of gotten quiet toward the end there. And that's when he said he couldn't reach a conclusion and that he didn't think it was appropriate for him to be on the jury. So I think that's something that you need to discuss directly with him." The foreperson stated the juror did not give any more information than that, "[b]ut it was enough that he's questioning his ability to serve."

The court then brought in the juror in question, Juror No. 4712218, and explained it had received a note from the foreperson stating there was concern about his ability to deliberate. Juror No. 4712218 explained:

> "There's some stuff going on at my school site right now where it's gonna end up in a courtroom most likely. And they brought it to my attention. And, okay, probably I'm feeling a little bias because I can't come to a conclusion that everyone else is doing, and it's because of the administration and superintendent within our school district. But I'm— there's some stuff they are doing that's wrong and they are starting to plot and make up stories to prove my stuff is false. [¶] So I see how if a school district superintendent and administrators are able to do it, I'm just now feeling that just the stories of the stuff that I heard is preventing me to get the same, I guess, conclusion that everyone else is getting. So they feel I'm biased towards it."

9.

The court responded that it was not Juror No. 4712218's job to agree with everyone.

> "If you can, that's good. But you have to form your own opinion in discussion with the other jurors. And to me the question from what you've told me it comes down to is you are perfectly well within your rights to disagree with the evaluation of the evidence that the other jurors have reached based upon what you have heard and your own opinion as long as it's not a result of some personal bias that you have as a result of the litigation. [¶] Does that make sense? There's a distinction here. It's okay to disagree. You can march on in your own direction. But on the other hand, it's not fair to realize that maybe you have an agenda or something that's going on that's preventing you from reasonably evaluating the evidence and discussing it with the other jurors."

Juror No. 4712218 responded, "Uh-huh. It's—it barely came to my mind today during all the discussion that was going on. And just the other stuff that's going on at work that I'm involved in, it's just entering into my mind, and it's kind of swaying me that certain stuff, because of what's going on there is going on here. That's just kind of what's—"

The court then asked Juror No. 4712218 if he thought "what's going on at work is affecting [his] ability and preventing [him] from being a fair and impartial juror." Juror No. 4712218 responded, "I think now I do." The following exchange then followed:

> "THE COURT: Court and counsel are back, and of course [defendant] is present. Juror Number 4712218 is still with us. [¶] And, Juror Number 4712218, let me make a couple of comments before I ask you a few more questions. [¶] When you're selected as a juror, you're selected as an individual with your own experience and background to serve on a jury panel, and you bring with you your life experiences, which are appropriate as long as you can be fair and impartial in your deliberations and continue your deliberations with the other jurors. The fact that you disagree with them isn't—is what happens sometimes in jury trials. People disagree. When you think about it, why would we use 12 rather than one? Because we want to make sure we have a group of 12 people that can all agree based on the evidence that's presented. So that's my preface.

10.

"But with that, I want to make sure that there's a couple things that are going—how things are going on, and one is this thought that you have that you might not be able to be a fair and impartial juror at this point, is this something that you've come to on your own or is this something that other jurors are telling you?

"JUROR NO. 4712218: Yeah. It came to me on my own. There was a lot of discussion going on. And then when they asked me what my thoughts were, when the main lady asked me what my thoughts were because I was quiet because I was thinking the whole time, that's when I just told her what was on my mind. And they just wanted to know a little bit more. And I didn't want to get into details with them about the stuff that was going on. But I kind of just shared a little bit of information with them, and then they felt that they should let you know. So they asked me, 'Do you have'—they just asked me if I disagreed with them going to you. I said, 'If you guys feel you guys need to do that, then go ahead.' [¶] I'm pretty much as fair an individual that someone can be. I cut my own Godson from my track team in high school, and he was my number two best one.

"THE COURT: Well, that's what we want. We want a juror that can call it like they see it.

"JUROR NO. 4712218: Yeah. It's just because of that stuff and how everyone else is right now, we're gonna be at a standstill. We're gonna be at a wall.

"THE COURT: Okay. Well, let me ask you the second one. [¶] Now, you just told me you cut your own Godson from the track team.

"JUROR NO. 4712218: Yes, sir.

"THE COURT: So you are a firm believer in what's right and what's wrong, what's acceptable behavior and what's not.

"JUROR NO. 4712218: Uh-huh.

"THE COURT: You understand that as a juror, if you have come reasonably with a deliberation and the other jurors and [*sic*] disagree with it, then that is your conviction. And sometimes if you're the holdout, it can be a little uncomfortable in the jury room. And it's not acceptable as a juror to look for a way out to avoid having to stand up and stand your ground by saying, 'Well, maybe, you know, I just can't be fair right now.'

11.

And I want to make sure you're not using this as an excuse to do [*sic*] your job.

"JUROR NO. 4712218: I'm not. If you want me to stay on, I'll stay on. I have no problem with that. I'm the lonely one right with everything that's going on. And this has been since March 2nd. So I'm fine holding my own ground and everything. I don't know. It just came to me today, and so I just told them, really.

"THE COURT: Okay. Sometimes these things have a way of jumping up at us and catching us before we've really had time to reflect on it. But the real issue I think that's before us is whether you can be a fair and impartial juror and continue in your deliberations with the other jurors and not be affected by any bias that you recognize that you have. [¶] Is that something you think you can do? And if you want a while to think about it, I can have you come back after lunch.

"JUROR NO. 4712218: That would be fine too. It doesn't matter.

"THE COURT: Well, it's up to you. I want to get a good sense of where you are in all of this to make sure that any decision I make is based upon a complete understanding of where you are.

"JUROR NO. 4712218: Well, there's—I don't know if I'm allowed to say it because of our defendant—nothing against you, [defendant]. I just don't know if I'm allowed to say what I would like to let you know because it would give an idea of where—what it is I'm thinking, what it is my verdict is.

"THE COURT: Okay. Well, I don't really want to go into your thought process of why you were voting a certain way.

"JUROR NO. 4712218: Right. And that's—

"THE COURT: That's very sacred ground for jurors.

"JUROR NO. 4712218: Yeah. That's what I'm trying not to bring up—

"THE COURT: And it's okay for you to have that position if it's based upon the factors that—the instructions we've given you. But if you reach a point whereas [*sic*] you reflect and sit as a juror and you're saying, 'Wait a minute. I don't belong here. I have too much going on in my own life. I don't think I can be fair anymore,' then the Court has to address that.

12.

But the fact that you disagree isn't a reason to let you go and substitute another juror in your place.

"JUROR NO. 4712218: Yes, sir. It's not that I'm disagreeing with them. I have no problem disagreeing with them at all. It's—what's going on there I feel is what could be going on here, and so that's in a way influencing my decision on the case.

"THE COURT: Okay. And with that, I'll allow each attorney one or two questions at this point. [¶] I'll start with [the prosecutor]. And I literally mean that, one or two. So think.

"[PROSECUTOR:] Q. When you say that what's going on there, indicating what's going on with the administration at your work could affect what's going on here, does that involve facts that are not necessarily, I guess, known to the other jurors as far as what they heard here in this court through the evidence, through the testimony, through the exhibits? Are you using something outside of what happened in this court to base your—I guess, your decision?

"A. That's what I'm trying to say, yes, sir, is that I'm allowing what's going on out there to influence my decision for this courtroom. Yeah.

"THE COURT: Thank you. [Defense counsel].

"[DEFENSE COUNSEL:] Q. In terms of what's going on right now with you and in terms of your ability to make a decision, is how you evaluate this case and what's going on any different than any other life experiences or common sense that you're applying to the case? Does that make sense? [¶] Like all of us bring a measure of common sense and life experiences. We're not robots. Is your way of evaluating this case with what's going on currently any different than any other life experience or common sense you're bringing to your reasoning and decisionmaking?

"A. The way I'm evaluating, because of the other stuff, is kind of going outside the norm. It's like—like it shocks everyone else that it's actually going on type stuff. Well, I don't know if that's answering your question or not. Would you be able to read it back to me?

"Q. I'll ask a different question.

"THE COURT: It would be a long readback.

"JUROR NUMBER 4712218: Okay.

13.

"[DEFENSE COUNSEL:] Q. Can you distinguish—the fact that what's happening to you is happening at a school and what's happening with this case happened in prison, the witnesses are different, the people, the players are all different, can you distinguish that?

"A. I know they are different. The only thing that is entering in me today is that the other people are high up, and they are able to—well, it seems that they might be able to pull it off regardless of my facts. And these individuals aren't nowhere near administration, so it would be easy for them to do it if these other individuals are—who have been in the institution longer, that they are able to do it as well. So that's—again, I don't know if it's answering your—

"THE COURT: I think that's as far as we're going to go with this. If you'll hang on, Juror Number 4712218, I'll see counsel at sidebar again.

"(A conference was held at sidebar which was not reported.)

"THE COURT: Court and counsel are back. [¶] Juror Number 4712218, based upon the comments that you have made to the court and based upon the current situation that you're going through, the court—and the comments you made, the court is going to excuse you, finding that you are no longer able to perform your duties as a juror in that you are being impacted by significant personal experiences going on at this time. [¶] I want to thank you for your service. I think your honesty and integrity that you've demonstrated as you've gone along as well as your ability to self reflect is remarkable. So thank you for your service, but you are excused at this time."

Defense counsel noted his objection to the court's discharge of Juror No. 4712218. Defense counsel asserted the information presented established that Juror No. 4712218 deliberated for the whole first day; he indicated the things happening around his school involving administrators "barely came to mind." Defense counsel asserted Juror No. 4712218 "sounded like an individual who felt pressured being the lone holdout," and it is not "uncommon for people to succumb to that kind of pressure." Defense counsel further argued Juror No. 4712218 seemed "like a person of incredible integrity" that was "exactly the type of juror that we want to render a fair and valid and just verdict. However, it seemed "he felt it was easier to cut to demands of the majority than stand his ground."

The prosecutor responded Juror No. 4712218 appeared to be a man of conviction who really wrestled with the issue, but "at the end his out-of-court experience was having an undue effect on his ability to be a fair and impartial juror in this case." And Juror No. 4712218 had articulated that to the court both at the beginning and at the end of questioning. So, the court was well within its discretion to discharge him.

The court noted it did not find Juror No. 4712218 was "seeking to avoid his jury service or to be a holdout juror." Rather, "he demonstrated through his answers and his willingness to continue to serve, his full willingness to embrace the lone position that he had." It was also clear to the court Juror No. 4712218 "had become aware that his approach to this case was being affected by an ongoing work situation which had similarities to the case, and as it was presented to him, it was affecting how he viewed it." The court noted it always had to give some deference to individual experiences that are brought in, but here it was clear Juror No. 4712218 "no longer could be a fair and impartial juror in his evaluation of the evidence, and he said as much." The court then replaced Juror No. 4712218 with an alternate.

After the jury delivered its verdict, defense counsel moved for a new trial based on the alleged improper removal of Juror No. 4712218 and the denial of the request for a self-defense instruction during the defense's closing argument. The court stated with regard to the removal of Juror No. 4712218, it was presented with a very unique set of facts in light of the juror's honesty. It gave a "general recitation" of its impression of the evidence presented. The court explained, Juror No. 4712218 "essentially was able to express an opinion that his personal work situation was leading him to see essentially a conspiracy against the defendant involving impliedly both alleged victims, the correctional officer victim, as well as the inmate victim, as part of a conspiracy against the defendant." The court continued:

> "And he believed that this was based upon as I said his work experience
> and was interfering with his ability to be a fair and impartial juror in

15.

evaluating the evidence. In light of there being absolute[y] no evidence to support such a conspiracy theory which is sort of an after the fact consideration but this court was struck with this particular juror's ability to reflect on the dilemma that he was in having been subject to where he was under pressure—currently under pressure at work due to his job situation which involved in his opinion people essentially conspiring to put him at a disadvantage or harm. And he identified essentially that this particular defendant could be in that same situation. Based upon the juror was clear that he was able to express his opinions as [defense counsel] has pointed out there's no issue of his failure to deliberate. There's not an issue of his being seeking [*sic*] a way to avoid jury service. He has integrity and strength to be a holdout juror. The issue was his inability to fairly and impartially evaluate the testimony based upon his particular personal situation. Now, in one sense the court—obviously if the jury had deadlocked and it was brought to the court's attention a mistrial subsequently declared or verdict in one fashion reached I don't think there would be any issue of validity of essentially juror[s] being able to take positions. We see that historically all the time that jurors will reach a position where they made up their mind and that's the extent of it how reasonable or unreasonable it is. But when a juror is able to identify those personal issues that are affecting him in his personal life at the time and realize that position he's holding as a result of that is interfering with his ability to be a fair and impartial juror, I don't think this court's removal of him—my removal of him was unreasonable or results in a mistrial."

**B.      Standard of Review and Applicable Law**

By statute, a trial court may remove any juror who "becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty." (§ 1089; *People v. Duff* (2014) 58 Cal.4th 527, 560.) Removal of a juror under section 1089 is committed to the discretion of the trial court, and we review whether the grounds for such removal appear in the record as a "demonstrable reality." (*People v. Thompson* (2010) 49 Cal.4th 79, 137.) "The demonstrable reality test entails a more comprehensive and less deferential review. It requires a showing that the court as trier of fact *did* rely on evidence that, in light of the entire record, supports its conclusion that [the basis for removal] was established." (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1052–1053; accord, *People v. Williams* (2015) 61 Cal.4th 1244, 1262.) The "reviewing court does not *reweigh* the evidence" under the demonstrable reality test. (*People v. Barnwell*,

*supra*, at p. 1053.) However, "the reviewing court must be confident that the trial court's conclusion is manifestly supported by evidence on which the court actually relied." (*Ibid*.)

### C. Analysis

Defendant contends Juror No. 4712218's comments did not establish a demonstrable reality he was biased and unable to perform his duties, but rather that he was applying his personal experience from his workplace to the facts of this case, and "that was informing his decision on the sufficiency of the evidence here," which was entirely appropriate under California law. He asserts the court's subsequent explanation of its reason for excusing Juror No. 4712218 demonstrates the court "continued to mistake the juror's proper consideration of the evidence in light of his personal experiences as signs of his being under such extraordinary stress in that situation that he could not function as a fair and impartial juror." Defendant contends there was no basis for the court to conclude the juror was unable to function fairly and impartially. He also asserts the reasons articulated by the court for excusing Juror No. 4712218 when denying defendant's new trial motion were wholly unsupported by the record. We conclude the evidence supports the trial's court's decision to discharge Juror No. 4712218, and the record establishes the court actually relied on such evidence in deciding to discharge the juror.

The California Supreme Court has held "[i]t is beyond dispute that a juror who cannot follow the court's instructions because of a personal bias should be discharged under section 1089." (*People v. Fuiava* (2012) 53 Cal.4th 622, 713; accord, *People v. Barnwell*, *supra*, 41 Cal.4th at p. 1051 ["A juror who is actually biased is unable to perform the duty to fairly deliberate and thus is subject to discharge].) And here, Juror No. 4712218 expressly admitted his personal situation occurring out of court was influencing him such that he did not believe he could be fair and impartial. Indeed, Juror

17.

No. 4712218 stated he was not worried about disagreeing generally or being a holdout, stating, "It's not that I'm disagreeing with them. I have no problem disagreeing with them at all." Rather, he was concerned because, in his words, he was "allowing what's going on out there to influence [his] decision for this courtroom." Juror No. 4712218 thus openly admitted to the court that his personal situation outside of the courtroom was causing him to be biased in his evaluation of the evidence presented in this case; that is, he did not think he could fairly and impartially weigh the evidence. (See *People v. Fuiava*, *supra*, 53 Cal.4th at p. 713; accord, *People v. Barnwell*, *supra*, 51 Cal.4th at p. 1051 ["bias against law enforcement officers that renders a juror unable to fairly weigh police testimony is grounds for the juror's replacement"]; *People v. Thomas* (1990) 218 Cal.App.3d 1477, 1482–1485 [ample cause to dismiss juror who disclaimed any particular bias towards police officers, but other jurors reported she could not accept testimony of officers because of her firm belief, based upon personal experience, that police officers in Los Angeles generally lie].)

Additionally, the record reflects the court actually relied on Juror No. 4712218's representations in concluding it was clear that due to Juror No. 4712218's ongoing work situation he "no longer could be a fair and impartial juror in his evaluation of the evidence, and he said as much." Accordingly, the court relied "' "on evidence that, in light of the entire record, supports its conclusion that bias was established."'" (*People v. Fuiava*, *supra*, 53 Cal.4th at p. 713.)

Unlike the cases defendant relies upon, this was not a situation where the court was simply evaluating Juror No. 4712218's introduction of or reliance upon extraneous information derived from his personal experience during deliberations. (*People v. Leonard* (2007) 40 Cal.4th 1370, 1413–1414 [juror "relied on his personal experience with firearms to form an opinion about the accuracy of the murder weapon, and he mentioned his experience to the other jurors when expressing his views during deliberations. His comments were a normal part of jury deliberations and were not

18.

misconduct"]; *People v. Yeoman* (2003) 31 Cal.4th 93, 159 [no substantial likelihood of resulting bias despite juror's remarks providing extraneous information regarding drug-testing practices, which was of conceivable relevance to case]; *People v. Pride* (1992) 3 Cal.4th 195, 267–268 [statements by juror who worked at prison about possibility of escape based upon his experience did not amount to misconduct—"he only said what any citizen might assume was true—that inmates sentenced to death are subjected to the tightest form of security and that they have fewer opportunities to escape than other inmates"].) Rather, here, Juror No. 4712218 expressly stated his personal situation was affecting his ability to fairly and impartially evaluate the evidence during the guilt-phase deliberations and, based on this representation, the court concluded excusal was merited. (Cf. *People v. Armstrong* (2016) 1 Cal.5th 432, 448, 451 [court erred in excusing juror for alleged refusal to deliberate where court's basis for dismissal was not manifestly supported by evidence]; *People v. Wilson* (2008) 44 Cal.4th 758, 825–830 [noting penalty phase deliberations under California's sentencing scheme are "inherently moral and normative, not factual," so it is not misconduct for a juror to interpret evidence based on his or her own life experiences during this phase of trial; evidence did not show juror was relying on facts not in evidence or that he was otherwise unable to fulfill his oath and duty as juror where he weighed mitigating evidence more heavily than other jurors based on his life experiences].) Accordingly, unlike the cases cited by defendant, the record before us establishes the grounds for dismissal—that Juror No. 4712218 could not be fair and impartial based on his personal situation, which he admitted was influencing his decisionmaking—was a demonstrable reality and the court actually relied on such grounds in excusing him. Thus, we cannot conclude the court erred in discharging him.

We reject defendant's contention.

19.

**II.    The Court Did Not Prejudicially Err in Refusing to Instruct the Jury on Self-defense**

Defendant next asserts there was sufficient evidence from which the jury could conclude inmate Rocha initiated the attack on defendant and defendant acted in self-defense; accordingly, the court erred in refusing to instruct the jury on self-defense. He also argues he was prejudiced by the court withdrawing the self-defense instruction in the middle of defense counsel's closing argument because it required defense counsel to reformulate his argument within seconds of being notified of the court's decision.

**A.    Relevant Factual Background**

During the jury instruction conference, defense counsel requested a self-defense instruction. The People argued there was no evidence defendant's attack on Rocha was done in self-defense. Rather, "[t]he victim testified that he was slashed from behind and that it was unprovoked and that he and the defendant engaged in a combat after that." "There [were] no fighting words or display[s] of aggression prior to the defendant attacking the victim unprovoked."

The defense's argument was based on the fact the fight occurred closer to defendant's cell than Rocha's cell, which the defense believed was some evidence Rocha was aggressive rather than defendant. Defense counsel further argued Officer Mendoza indicated Rocha never made it downstairs though the other inmates came downstairs for their food trays; accordingly, there was some evidence "Rocha went from cell 221, overshot the staircase and went directly to 225." Defense counsel argued, in light of the factual inconsistencies, there was some indication "Rocha was the aggressor all along," and "the self-defense instruction could be persuasive for the jury to consider."

The court agreed with defense counsel the factual inconsistencies and witness statements "suggest potentially two different versions of the fight." But, "[i]n this particular case, where the defense is based on some contradictions in the People's case without any other evidence being presented by the defense, that there is some self defense

20.

and the focus of the self-defense instruction on the defendant's reasonable beliefs, [the court] would have to agree with the People on this, that the simple contradiction of the evidence is not sufficient to require this court to give an instruction of self defense when there does not seem to be any support for that in light of the state of the evidence." The court noted, without defendant "testifying or having someone testify to having seen actions that would suggest that he was acting in self defense more than what we have here, which is an inconsistency, the Court declines to give [CALCRIM No. ]3470."

After the prosecutor presented his closing argument and before defense counsel began his closing argument, the court noted its previous decision not to give CALCRIM No. 3470 on self-defense and defense of another. However, the court reversed its decision after reflecting on it further and reviewing the use notes to the instruction. The court based its decision on the conflict between Rocha's and the officers' testimony. The court stated Rocha testified the incident began with him being attacked and then he pursued defendant upstairs to the second floor where they began to wrestle; whereas, the officers observed a punching fight on the second floor in its entirety. The court held a reasonable jury believing the officers' testimony could conclude "that the only explanation for that particular assault then would fall into the defense position that there's some evidence to suggest that Mr. Rocha might have been the aggressor." In concluding that was "not an unreasonable argument to make" and it was not "out of the realm of rationality for a jury to agree with that set of facts," the court stated it was inclined to give the self-defense instruction.

The prosecutor argued the evidence was insufficient to support the defense; there was only "conjecture and speculation that does not rise to the level of evidence that would trigger the self defense." The prosecutor also argued the People's case would be prejudiced if the defense was permitted to argue self-defense when the People could not address it in their closing argument and if the court instructed the jury with the self-defense instruction after argument.

21.

The court held "if the jury rules out the credibility of [Rocha] and relies on the correctional officer, it can change the posture to why the fight occurred where it did and raise the specter of self defense." Accordingly, it would give CALCRIM No. 3470.

Defense counsel began discussing the incident with Officer Sean Gonzales in closing argument. The court then interjected and asked counsel for a sidebar, during which it again reversed its decision on the self-defense instruction. The court explained on the record that it realized that it "was commingling the concept of self defense with the concept of, essentially, a reasonable doubt," and the discrepancy in the evidence "did not establish substantial evidence of the defense." It noted it wanted to make sure counsel was advised of its decision before counsel "got into that particular area of argument."

Defense counsel noted it was appropriate for the court to ask for a sidebar after he said he would be "changing gears," in light of the subject matter that was approaching. He further noted he altered his "closing argument[] to exclude any consideration of a self-defense argument and went with an alternative theory."

## B.     Standard of Review

We review de novo a court's decision not to give a particular jury instruction. (See *People v. Simon* (2016) 1 Cal.5th 98, 133; *People v. Manriquez* (2005) 37 Cal.4th 547, 581; accord, *People v. Waidla* (2000) 22 Cal.4th 690, 733.) An instruction requested by a defendant need only be given "if it is supported by substantial evidence, that is, evidence sufficient to deserve jury consideration." (*People v. Marshall* (1997) 15 Cal.4th 1, 39; accord, *People v. Moon* (2005) 37 Cal.4th 1, 30 ["a trial court may properly refuse an instruction offered by the defendant if it … is not supported by substantial evidence"]; *People v. Curtis* (1994) 30 Cal.App.4th 1337, 1355 ["A trial court has no duty to instruct the jury on a defense—even at the defendant's request—unless the defense is supported by substantial evidence"].) "The trial court need not give

22.

instructions based solely on conjecture and speculation." (*People v. Young* (2005) 34 Cal.4th 1149, 1200.)

## C. Applicable Law

To justify an act of self-defense, the defendant must have an honest and reasonable belief bodily injury is imminent. (See *People v. Minifie* (1996) 13 Cal.4th 1055, 1064; accord, *People v. Perez* (1970) 12 Cal.App.3d 232, 236 [the right of self-defense is based upon the appearance of imminent peril to the person attacked].) "Although the belief in the need to defend must be objectively reasonable, a jury must consider what 'would appear to be necessary to a reasonable person in a similar situation with similar knowledge ….' [Citation.] It judges reasonableness 'from the point of view of a reasonable person in the position of defendant.…'" (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082–1083.)

## D. Analysis

Defendant contends the jury could have concluded Rocha initiated the attack for some reason unrelated to defendant cutting him, "e.g., to gain prestige in prison—and in the course of the altercation, he was either cut by an external object or by [defendant], acting in self-defense." He asserts the jury could have reasoned, in light of Rocha's violent past and the nature of Rocha's and defendant's injuries, that Rocha was not cut before the fight (witnessed by the officers) began. He contends "the slight quantity of blood on [his] body and clothing differed markedly from the extensive blood marks on Rocha's hands and clothes, suggesting that the cut was not inflicted on him until shortly before the fight was interrupted on the top tier by correctional officers." He also contends the court's timing in notifying defense counsel of its decision not to give the self-defense instruction mid-closing argument "severely prejudiced" defendant. The People assert the court correctly withdrew the self-defense instruction because the evidence did not support it. We agree with the People.

23.

The trial court did not err in refusing to give a self-defense instruction because substantial evidence did not support it.  (See *People v. Blair* (2005) 36 Cal.4th 686, 744–745, overruled on other grounds in *People v. Black* (2014) 58 Cal.4th 912, 919 [substantial evidence means "evidence from which a jury composed of reasonable persons could conclude that the facts underlying the particular instruction exist"].)  "[B]oth self-defense and defense of others, whether perfect or imperfect, require an actual fear of *imminent* harm."  (*People v. Butler* (2009) 46 Cal.4th 847, 868.)  Here, the jury would have had to speculate regarding evidence it did not have—evidence that defendant slashed Rocha in response to a threat by Rocha—in order to conclude defendant acted in self-defense.  (See *People v. Perez*, *supra*, 12 Cal.App.3d at p. 236 ["The right to have a jury instructed on self-defense must be based upon more than imagined facts or inferences"]; accord, *People v. Hughes* (2002) 27 Cal.4th 287, 365 [inference based only on speculation is not reasonable].)

And though the jury can infer defendant's state of mind from testimony presented by other witnesses, here there was no evidence defendant cut Rocha's face out of fear or that he appeared to be fearful at the time.  At most, the evidence established that at some point defendant and Rocha engaged in a fight on the second tier which, Rocha testified, occurred after defendant cut him.  There was no evidence Rocha initiated the attack or that defendant cut Rocha out of fear that bodily injury was imminent.  Accordingly, the court properly denied defendant's request for a self-defense instruction because substantial evidence did not support it.  (See *People v. Sedeno* (1974) 10 Cal.3d 703, 718, disapproved on other grounds in *People v. Blakeley* (2000) 23 Cal.4th 82, 89, ["It is not error to refuse a request for instructions on self-defense when there is no evidence from which it can be inferred that the defendant feared great bodily harm or death at the hands of the victim"]; accord, CALCRIM No. 3470 [a defendant is not guilty "if (he/she) used force against the other person in lawful (self-defense/[or] defense of another)," which requires, in part, that "[t]he defendant reasonably believed that (he/she …) was in

imminent danger of suffering bodily injury [or was in imminent danger of being touched unlawfully]"].)

We reject defendant's contention.

**III. Defendant Is Entitled to a Remand for Resentencing in Light of Senate Bill 1393**

Defendant also asserts he is entitled to a new sentencing hearing for the court to exercise its discretion and consider whether to strike his prior serious felony enhancements in light of Senate Bill 1393.

**A.    Relevant Factual Background**

Before sentencing defendant, the court noted three circumstances in aggravation: (1) defendant had engaged in violent conduct in his prior offenses based upon the nature of his convictions; (2) defendant's convictions as an adult and sustained petitions as a juvenile were numerous; and (3) defendant was serving a sentence in state prison when the crimes were committed. The court then sentenced defendant to the sentences prescribed by law on counts 1 (mayhem) and 2 (felony assault with a deadly weapon by a prisoner)—25 years to life on each count—with no further comment. The court enhanced defendant's sentence on count 1 by one year pursuant to section 12022, subdivision (b)(1), 10 years pursuant to section 667, subdivision (a), and one additional year pursuant to section 667.5, former subdivision (b). The court enhanced defendant's sentence on count 2 by three years pursuant to section 12022.7, subdivision (a) and one additional year pursuant to section 667.5, former subdivision (b), and stayed the entire sentence pursuant to section 654. The court sentenced defendant to the upper term of eight years on count 3 (felony possession of a weapon by a prisoner) and stayed the sentence pursuant to section 654. Finally, the court sentenced defendant to the upper term of eight years on count 4 (felony aggravated battery on a peace officer by gassing), enhanced by one year pursuant to section 667.5, former subdivision (b), to be served consecutively to his sentence on count 1, for a total term of 25 years to life, plus 21 years.

## B. Analysis

Senate Bill 1393, signed into law on September 30, 2018, amends sections 667 and 1385 to provide the trial court with discretion to dismiss, in furtherance of justice, five-year enhancements imposed pursuant to section 667, subdivision (a)(1). The new law took effect on January 1, 2019.

As the parties note, defendant was sentenced in this case on August 14, 2018, before Senate Bill 1393 was passed and took effect. Thus, at the time of sentencing, the trial court did not have discretion to strike the prior serious felony enhancements imposed pursuant to section 667, subdivision (a). Defendant now seeks a remand for the court to exercise its newfound discretion and to consider whether to strike his prior serious felony conviction enhancements. The People agree the changes to sections 667 and 1385 are retroactive but respond remand is not necessary because "the trial court's statements at sentencing and other sentencing choices clearly indicated that it would not have dismissed the prior serious felony enhancements" even if it had the power to do so. They rely on *People v. Jones* (2019) 32 Cal.App.5th 267 (*Jones*) and *People v. McVey* (2018) 24 Cal.App.5th 405 (*McVey*) in support of their argument. We conclude remand is warranted.

The California Supreme Court has held, when a court is unaware of the scope of its discretionary powers, "the appropriate remedy is to remand for resentencing unless the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.' [Citations.]" (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.) Post-*Gutierrez*, most of the published cases considering whether remand is appropriate to allow the trial court to exercise its discretion in the first instance have concluded remand is appropriate. (See, e.g., *People v. Johnson* (2019) 32 Cal.App.5th 26, 69 [Sen. Bills Nos. 1393 & 620 (2017–2018 Reg. Sess.)]; *People v. Garcia* (2018) 28 Cal.App.5th 961, 973 [Sen. Bill 1393].) *Jones* and *McVey*, cited by the People and in which the appellate courts declined to remand, are in the minority.

26.

In *Jones*, the Court of Appeal held remand for the court to exercise its discretion to consider whether to strike the section 667, subdivision (a) enhancement was unnecessary in light of the record. (*Jones*, *supra*, 32 Cal.App.5th at pp. 273–275.) In *Jones*, the defendant was convicted of attempted premeditated murder, assault with a deadly weapon, and assault likely to produce great bodily injury after he attacked a bar employee with a knife after the bar closed. (*Id*. at pp. 269–271.) The attack stemmed from a third party's earlier dissatisfaction over how a drink was mixed at the bar. (*Ibid*.) The defendant committed the crimes within months of being released from prison after serving a 10-year sentence for stabbing his ex-wife multiple times with a knife. (*Id*. at pp. 273–274.) In concluding remand for resentencing in light of Senate Bill 1393 was not warranted, the Court of Appeal stated, "Besides not exercising its discretion for leniency when it could have, the trial court made clear its intention to impose the most stringent sentence it could justifiably impose. It stated there was no doubt the verdict was correct, [the] defendant's actions were premeditated, dangerous, senseless and absurd, he attempted to kill [the victim] only a few months after being released from prison where he had been for 10 years, and the court took 'great satisfaction' in imposing the 'very lengthy sentence' it imposed." (*Jones*, at pp. 274–275; accord, *McVey*, *supra*, 24 Cal.App.5th at p. 419 [concluding remand was unnecessary in light of court's "express consideration of the factors in aggravation and mitigation, its pointed comments on the record, and its deliberate choice of the highest possible term for the firearm enhancement"].)

Here, the record does not include pointed comments such as those the trial court made in *McVey* and *Jones*; rather, the court imposed the sentences and enhancements without further commentary. And the court lacked the discretion to strike or stay the prior serious felony enhancements at the time of sentencing. While the trial court imposed the upper terms for counts 3 and 4, we cannot conclude this fact, in and of itself, reflects a clear indication by the trial court that it would not have struck the prior serious

felony enhancements if it had had the discretion to do so.  Accordingly, remand is appropriate so the trial court may exercise its discretion in the first instance in light of Senate Bill 1393.  We express no opinion on how the trial court should exercise its discretion on remand.

## IV.     Defendant's Prison Prior Enhancements Must Be Stricken

In supplemental briefing, defendant contends his one-year prior prison term enhancements  imposed pursuant to section 667.5, former subdivision (b) must be stricken in light of Senate Bill 136 (Stats. 2019, ch. 590, § 1), which was signed into law on October 8, 2019, and became effective on January 1, 2020.  The People concede Senate Bill 136 applies retroactively to this case and the prison prior enhancements should be stricken.  (See *In re Estrada* (1965) 63 Cal.2d 740, 742.)  On remand, we direct the trial court to strike these enhancements.

At the time defendant was charged, convicted, and sentenced, section 667.5, former subdivision (b), provided, in part:

> "[W]here the new offense is any felony for which a prison sentence or a sentence of imprisonment in a county jail under subdivision (h) of Section 1170 is imposed or is not suspended, in addition and consecutive to any other sentence therefor, the court shall impose a one-year term for each prior separate prison term or county jail term imposed under subdivision (h) of Section 1170 or when sentence is not suspended for any felony …."

After defendant was sentenced, but while his case was still pending on appeal, the Legislature enacted Senate Bill 136.  Effective January 1, 2020, section 667.5, subdivision (b) now provides, in pertinent part:

> "[W]here the new offense is any felony for which a prison sentence or a sentence of imprisonment in a county jail under subdivision (h) of Section 1170 is imposed or is not suspended, in addition and consecutive to any other sentence therefor, the court shall impose a one-year term for each prior separate prison term for a sexually violent offense as defined in subdivision (b) of Section 6600 of the Welfare and Institutions Code …."

In other words, a prior prison term enhancement will only apply if a defendant served the prior prison term for a qualifying "sexually violent offense." The Legislature did not expressly declare or in any way indicate it did not intend Senate Bill 136 to apply retroactively. "When an amendatory statute … lessens the punishment for a crime …, it is reasonable for courts to infer, absent evidence to the contrary and as a matter of statutory construction, that the Legislature intended the amendatory statute to retroactively apply to the fullest extent constitutionally permissible—that is, to all cases not final when the statute becomes effective. [Citations.]" (*People v. Garcia*, *supra*, 28 Cal.App.5th at p. 972.)

We conclude Senate Bill 136 applies retroactively to this case and, because defendant's prior prison terms were not served for sexually violent offenses, the related enhancements imposed pursuant to section 667.5, former subdivision (b) are now unauthorized and must be stricken on remand.

## DISPOSITION

The matter is remanded for a new sentencing hearing to permit the trial court to exercise its discretion regarding whether to strike the prior serious felony enhancement in light of Senate Bill 1393 and to strike the enhancements imposed under section 667.5, former subdivision (b). In all other respects, the judgment is affirmed.

PEÑA, J.

WE CONCUR:

LEVY, Acting P.J.

FRANSON, J.

29.